UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **United States of America *ex rel.* Peter Rothschild, M.D. and Jason Taylor,** | Case No. 1:17-cv-720 |
| Plaintiffs | Judge Susan J. Dlott |
| v. | |
| **Proscan Imaging, LLC**<br>5400 Kennedy Avenue<br>Cincinnati, Ohio 45213 | |
| **Proscan Reading Services, LLC**<br>5400 Kennedy Avenue<br>Cincinnati, Ohio 45213 | **Filed Under Seal** |
| **Stephen Pomeranz, M.D.**<br>5400 Kennedy Avenue<br>Cincinnati, Ohio 45213 | |
| and | |
| **Malcolm Shupeck, M.D., F.A.C.S.**<br>5400 Kennedy Avenue<br>Cincinnati, Ohio 45213 | |
| Defendants | |

**FIRST AMENDED FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL UNDER 31 U.S.C. § 3730(B)(2), WITH JURY DEMAND**

The United States of America *ex rel.* Peter Rothschild, M.D. and *ex rel.* Jason

Taylor respectfully files this action against Defendants ProScan Imaging, LLC and its

affiliated entities, Stephen Pomeranz, M.D., and Malcolm Shupeck, M.D., F.A.C.S., under

the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–33.

## I. NATURE OF THE ACTION

1.     This action arises out of Defendants' deliberate and corrupt overbilling and fraudulent submission of bills to health-insurance programs administered by the federal government. Relators bring this action to remedy the harm Defendants have caused the United States of America by submitting, and causing to be submitted, false and fraudulent bills for radiology interpretations through the Medicare, Medicaid, and Tricare programs (the "government programs") and by receiving payment for those bills in violation of federal law.

2.     Defendants have repeatedly, over a period of up to 21 years and continuing through the present, submitted bills to the government, and caused others to submit bills to the government, for radiology services that were performed by physicians' assistants and chiropractors, rather than by licensed physicians (D.O.s or M.D.s), in violation of federal rules and regulations. Moreover, Defendants have wrongfully accepted and made patient referrals in violation of the Stark Law, 42 U.S.C. § 1395nn, and federal healthcare Anti-Kickback statute, 42 U.S.C. 1320a-7b.

## II. PARTIES

3.     Relator **PETER ROTHSCHILD, M.D.** is a U.S. citizen and a California resident. Dr. Rothschild is a board-certified diagnostic radiologist with over 35 years of experience. Among other distinctions, Dr. Rothschild was the medical director of the team that developed the open MRI, holds an MRI patent, is the editor of the first open-MRI textbook, and gives lectures on MRIs both nationwide and internationally. (An "open MRI" is one in which the patient passes through a large ring-like structure to be scanned, as opposed to

a "closed MRI," which requires patients to be placed in a narrow tube, causing claustrophobia and discomfort for many patients.) He brings this action as an original source based upon direct and unique information obtained from his medical practice.

4.     Relator **JASON TAYLOR** is a U.S. citizen and a Kentucky resident. Taylor is a registered radiologic technologist and radiology practitioner assistant who brings this action as an original source based upon direct and unique information obtained from his employment relationship with ProScan from August 2015 to April 2016.

5.     Defendant **PROSCAN IMAGING, LLC** ("ProScan") is a for-profit limited liability corporation whose principal place of business is at 5400 Kennedy Avenue, Cincinnati, Ohio, 45213. ProScan operates 25 freestanding radiology centers in seven states and, through a related entity known as ProScan Reading Services, boasts that it provides a "wide range of teleradiology services to hundreds of physicians and medical centers across the United States." (Quoted from *www.proscan.com, About Us.*)

6.     Defendant **PROSCAN READING SERVICES, LLC** ("ProScan Reading") is a for-profit limited liability corporation whose principal place of business is at 5400 Kennedy Avenue, Cincinnati, Ohio, 45213. Like ProScan, ProScan Reading boasts that it provides a "wide range of teleradiology services to hundreds of physicians and medical centers across the United States." (Quoted from *www.proscan.com, About Us.*)

7.     Defendant **STEPHEN POMERANZ, M.D.** is an individual residing in the State of Ohio, whose principal business address is 5400 Kennedy Avenue, Cincinnati, Ohio, 45213. Pomeranz is a board-certified radiologist who is also the CEO and Medical Director of ProScan and the founder of ProScan Reading.

8.     Defendant **MALCOLM SHUPECK, M.D., F.A.C.S.** is an individual residing in the State of Ohio, whose principal business address is 5400 Kennedy Avenue, Cincinnati, Ohio, 45213. Shupeck is a neurological surgeon who is the Associate Medical Director of ProScan and the Director of Fellowship Administration of the ProScan Imaging Education Foundation.

### III.   JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b), which provide this Court with original jurisdiction to hear a *qui tam* action. Relators are "original sources" and bring this action in the name of the United States as contemplated by the False Claims Act, 31 U.S.C. §§ 3729–33.

10.     Venue is proper in this District because each Defendant can be found in, resides in, and/or transacts business in, this judicial district. Moreover, acts prohibited by 31 U.S.C. § 3729 have been committed by Defendants in this judicial district, making venue proper under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a).

11.     Relators have made voluntary disclosures to the United States government before filing this lawsuit, as required by 31 U.S.C. § 3730(b)(2).

### IV.   FACTS

**A.  The government programs and statutory framework**

12.     Medicare is a health-insurance program that is funded by taxpayer revenue and administered by the United States government. The Center for Medicare and Medicaid Services at the U.S. Department of Health and Human Services implements and oversees the program. Medicare's purpose is to act as an insurance company in providing medical care and

durable medical equipment to persons over 65 years of age, persons with a disability, and other persons who qualify for the program.

13. Medicaid is a health-insurance program funded by state and federal taxpayer revenue and administered by the United States government and state governments. Medicaid is designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially needy individuals who meet certain income requirements. The U.S. Department of Health and Human Services oversees the program.

14. Tricare is a United States government-funded program that provides medical benefits to active and retired Uniformed Service members, and to families of active-duty, retired, and deceased service members. The program further provides medical benefits to reservists and their families. Tricare is administered by the U.S. Department of Defense.

15. The False Claims Act, in 31 U.S.C. § 3729(a)(1), prohibits knowingly presenting, causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment. Further, the False Claims Act, in 31 U.S.C. § 3729(a)(2), prohibits knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to obtain payment or approval for a false or fraudulent claim.

16. Each violation of the False Claims Act is a violation of federal law that is punishable by three times the amount of the actual damages sustained by the government and a civil penalty of between $5,500 and $11,000 per claim for violations before November 1, 2015, and between $10,957 and $21,916 per claim for violations after November 1, 2015.

17. Under the False Claims Act, a "claim" is defined as any request or demand, whether under contract or otherwise, for money or property, which is made to a contractor, grantee, or other recipient, if the U.S. government provides any portion of the money or

property that is requested or demanded, or if the government will reimburse such contractor, grantee, or recipient for any portion of the money or property requested.

18.     Under the False Claims Act, the term "knowingly" means that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. The statute requires no proof of specific intent to defraud.

19.     Defendants' actions described below constitute false and fraudulent billing practices and claims under the False Claims Act. Defendants' actions caused the submission to the government of thousands, or even hundreds of thousands, of false claims by doctors, hospitals, and other medical clinics and medical providers. The false claims were for advanced diagnostic-image services that were not performed by a licensed physician, and thus, as explained below, were non-reimbursable under the terms of Medicare, Medicaid, and Tricare. Defendants' actions also resulted in both the technical and the professional components of these services being deficient. Simply put, an advanced diagnostic image has no reimbursable value under government programs unless a physician lawfully interprets it. But that didn't happen.

20.     The purpose of Defendants' fraudulent scheme, as described below, was to wrongfully obtain both government and private-insurer reimbursement.

21.     The government programs require that all entries that are part of a medical record be signed and dated promptly by the service provider. Federal regulations require that radiologists who interpret images and provide the service authenticate each billed report and personally make the entry by the radiologist's signature. In other words, the radiologist who interprets the image must sign the report of his or her own interpretation. A non-reviewing radiologist may not sign a report that was composed and/or transcribed by a different

radiologist or other individual. And a non-physician may not interpret or bill for interpreting advanced diagnostic images for the Medicare program. *See, e.g.,* CMS Manual System, Pub. 100-4, Medicare Claims Processing Manual, Chapter 13, Sections 20-20.2.3 (discussing payment for professional component of radiology services versus technical component); CMS Manual System, Pub. 100-2, Medicare Benefit Policy Manual, Chapter 15, Section 80 (discussing supervision requirements for technical component of radiology procedures); CMS Manual System, Pub. 100-08, Medicare Program Integrity Manual Chapter 3, Section 3.3.2.4 (discussing signature requirements).

22. In the teleradiology field, the government programs permit physicians to use digital signatures for such authentication. But the same rules regarding the person providing the signature apply: that is, a radiologist's digital signature on a report indicates that such physician interpreted the film and dictated the report. *See, e.g.,* CMS Manual System, Pub. 100-08, Medicare Program Integrity Manual Chapter 3, Section 3.3.2.4 (discussing signature requirements).

23. Because of Defendants' knowing actions, third-party medical providers such as hospitals and independent imaging centers throughout the country who are using Defendants for their reading services have—perhaps unknowingly—submitted false global-billing claims for government reimbursement in violation of federal statutes, rules, and regulations.

24. Moreover, the government programs will not pay for or reimburse for interpretation of advanced diagnostic images if the radiologist performing the reviews and interpretation of images is not licensed in the state in which the radiology exam was performed. *See, e.g.,* CMS Manual System, Pub. 100-08, Medicare Program Integrity Manual, Change Request 8545, dated January 24, 2014. Similarly, state law requires that a radiologist be

licensed in the state if he interprets/reads any radiology images performed in that state. *See, e.g.,* Ohio Rev. Code § 4731.296 (outlining qualifications to obtain license to practice telemedicine in Ohio); Tex. Occ. Code § 151.056 (telemedicine providers must be licensed in Texas to perform any act affecting diagnosis or treatment of Texas patient).

25.     Under HIPAA, a physician's digital signature and its authentication must not be accessible or usable by anyone other than the person whose signature it is. This rule is designed to ensure that no one other than the reviewing physician can create, edit, alter, or delete the medical record upon which the physician's digital signature appears. HIPAA also requires an audit trail (event log) of everyone who looks at or changes anything in an image or report. All Picture Archive and Communications Systems ("PACS," which is a medical imaging management protocol) and Radiology Information Systems ("RIS," which is a reporting system like the one Proscan uses) have a study-event log showing who dictated the report (interpreted the MRI) on each patient, when that was done, whether the case was opened after the dictation (which would be necessary to review it), how long the case was opened the second time, and what (if any) changes were made to the report after it was dictated.

26.     Federal law also prohibits physicians from referring patients covered by Medicare or Medicaid for certain "Designated Health Services" to an entity in which the physician or one of their immediate family members has a financial interest. This law is commonly known as the "Stark Law," 42 U.S.C. § 1395nn.

27.     Radiology and other imaging services are a "Designated Health Service" under the Stark Law. Therefore, self-referrals are prohibited unless an exception to the Stark Law applies. 42 U.S.C. § 1395nn(h)(6)(D).

28.     The Stark Law also prohibits physicians from entering into an arrangement or

scheme, such as a cross-referral arrangement, which has as its principal purpose the assurance of referrals to an entity if those referrals would be in violation of the Stark Law if the physician made them directly. 42 U.S.C. § 1395nn(g)(4).

## B. ProScan defrauds the government and patients by using non-physician "ghost readers" to read MRIs.

29.     Defendant Pomeranz started Defendant ProScan in 1995. The company is headquartered in Cincinnati, Ohio. ProScan currently operates 25 freestanding imaging centers in seven states, including Ohio and Kentucky. Additionally, ProScan advertises that its teleradiology branch, ProScan Reading Services LLC, "provides a wide range of teleradiology services to hundreds of physicians and medical centers across the United States." ProScan reads for 500 sites (hospitals and imaging centers) throughout the country and interprets 2,000 MRIs a day, making it one of the largest MRI-reading companies in the country.

30.     For at least the past decade, radiology has faced a dilemma comprising three parts.

31.     First, there is a shortage of qualified and certified radiologists, causing their salaries to increase to meet demand.

32.     Second, the reimbursement rates from both private insurance companies and the federal government have decreased by over 50% in the last ten years. Therefore, a radiologist would have to work twice as many hours and read twice as many cases to bring in the same amount of money. This puts huge financial pressure on radiology groups and imaging centers.

33.     Third, the law requires that a radiologist be licensed in every state from which he or she reads an image, even if the radiologist is reading the cases remotely though

teleradiology in a different state. The radiologist must also be credentialed by every insurance company and with the government programs for each imaging center or hospital in which the radiologist provides professional services. These licensing and credentialing processes can take anywhere from a year to a year-and-a-half for each radiologist hired.

34. Defendant ProScan, through Defendant Dr. Pomeranz, believes that it has solved this dilemma by using non-physician "ghost readers" to circumvent the stringent requirements placed upon radiologists, while at the same time eliminating significant overhead costs associated with following the rules. Since Dr. Pomeranz and Dr. Shupeck are licensed in all states where studies originate and are credentialed for every insurance carrier (including government providers) at each facility, all they have to do is have a ghost signer place their electronic signature at the bottom of the report and they are paid for interpreting cases they never saw.

35. Defendant ProScan advertises the services of approximately 35 board-certified radiologists on its website. Defendant Pomeranz himself has been a board-certified radiologist since 1985, and is licensed in Ohio as well as in other states. In its marketing materials, ProScan claims that it has a teleradiology base in excess of 500 sites, that it provides 24 hours' routine turnaround and that it interprets over 130,000 MSK (musculoskeletal), MRI, and CT examinations every year, as well as over 87,500 spine cases and 17,500 brain, head, and neck cases. Altogether, ProScan boasts that it reads 350,000 studies per year. In its marketing materials (current as of a few years ago), ProScan claims that it has read over 1.5 million studies.

36. It is not physically possible for the number of radiologists employed by ProScan to read the number of studies ProScan claims. As a comparison, Relator Dr. Peter Rothschild owns an imaging center that employs four full-time and five part-time radiologists. These nine

radiologists read 110-130 studies per day. ProScan claims that it has 35 radiologists, although two of those listed on its website are not radiologists (one is a chiropractor and one, Shupeck, is a neurosurgeon). It also reads for 500 outside sites, such as other imaging centers and hospitals. It takes a typical radiologist at least 10 minutes on average to read an MRI case. Each MRI case can contain over 300 images and each image must be reviewed separately. Often, complicated cases can take 20-30 minutes or longer to read, especially if more information or other studies are needed. And this does not include the time it takes to read over and finalize a report, which also requires a significant investment of time. Thus, even assuming that all of ProScan's 35 radiologists read some MRIs (in fact some are part-time and others may not read at all), ProScan could never complete the number of scans that it claims it does without employing non-radiologist help. For to do so, ProScan would need at least 65 radiologists, not 35.

37.     ProScan maintains this incredible and impossible pace by deceptively, and in violation of federal regulations, using physician assistants and other non-physicians, whom it also employs, to read the cases—a fact hidden from the patients and their referring doctors. While these non-physicians are medical professionals, none of them are authorized to diagnose or interpret advanced diagnostic images, such as MRIs. They are not physicians, but assistants or other medical professionals. According to Medicare regulations, they cannot render a diagnosis for patients undergoing advanced diagnostic imaging. The United States will not pay a professional fee or technical fee for a case where a non-physician such as a physician assistant performed the radiologic interpretation. For a valid claim to exist under federal government programs, a physician—an M.D. or a D.O.—must review and independently interpret the advanced diagnostic image. But ProScan uses physician assistants to illegally "ghost read"

advanced diagnostic images in lieu of having cases read by a qualified, licensed physician.

38.     A radiologist has an undergraduate degree and four years of medical school, has passed all three parts of the U.S. Medical Licensing Exam, and has a year-long internship before beginning residency in diagnostic radiology. This residency, which is extremely competitive, lasts for a minimum of four additional years, and often five to six years. In other words, diagnostic radiologists have five to seven years of training after medical school before they can practice in the field. Additionally, prospective radiologists must then pass the two comprehensive exams required by the American Board of Radiology. These radiologists are trained to see the little things in an MRI—such as small cancers that are often curable—that other doctors would miss. Physician's assistants, no matter how intelligent or talented, and no matter if they have received additional rudimentary, uncertified training from Defendants Dr. Pomeranz's and ProScan, lack the background and experience to properly read and diagnose advanced diagnostic image studies like MRIs. Furthermore, a physician's assistant lacks the comprehensive medical education to understand the pathophysiology of the disease processes, and the implication of these diseases, that a radiologist has. This is because the training to become a P.A. does not include the extensive array of classes taken by a medical student or the broad experience a radiology resident receives. Instead, a physician's assistant generally has two years of education in all aspects of medicine, and has only limited, if any, exposure to radiology, and likely no exposure to advanced imaging studies like MRIs.

39.     Using these unqualified, untrained, untested, unlicensed, inexperienced non-physicians with only a few years of post-high-school education is devastating families who trusted Dr. Pomerantz and ProScan. As explained in more detail with examples below, misdiagnoses—and missed diagnoses—occur frequently. If these millions of MRIs were re-read

by board-certified radiologists, the true scale of this tragedy would become clear.

40.     In 2015, Relator Jason Taylor was hired to work in Proscan's marketing and sales department in the company's Jeffersontown, Kentucky facility. In February 2016, Pomeranz's senior executive assistant contacted Taylor to schedule a meeting between Taylor and Pomeranz regarding supposed business ventures between Taylor and Pomeranz. At the meeting, Pomeranz attempted to recruit Taylor to become a "ghost reader" for ProScan by participating in a one-year, uncertified, and secret training program administered by ProScan. Pomeranz made it clear that there would be great financial advantage to Taylor by doing so and that Taylor could make a lot more money as a ghost reader than he was making in the marketing department. Uncomfortable with this suggestion, Taylor declined, and did not renew his contract with ProScan when it expired in the Spring of 2016.

41.     Taylor learned that ProScan had a practice of having physician assistants perform the interpretation of advanced diagnostic images, and that it did not abide by the government's requirement that a licensed physician perform all such interpretation. The extent to which ProScan used this practice can be discerned by examining the signature blocks on the reports ProScan generated for its clients.

42.     In a medical-imaging report from ProScan, each person who was involved in preparing the report is identified in the report and logged into the PACS/RIS system with a time-and-date stamp. The report contains the signature of the physician under whom the study is billed, followed by his printed name. Underneath this line, the report has a line with the initials of everyone involved in preparing that report, which should include the doctor and the transcriptionist. The third line below the signature begins with "D" for dictated, with initials of the person doing the dictation, a date, and a time. The person who dictates the report is the

person who is reading or interpreting the advanced diagnostic image. It is obviously not possible to dictate a report on a case without first reading the images associated with that case. Finally, on a ProScan imaging-report signature, there is a line starting with "T" for transcription, followed by the initials of the transcriptionist, a date, and a time. In addition to the report, there is computer evidence that will corroborate who read the study and who signed it.

43.     In many of the reports from ProScan, however, the signature block reveals that the interpretation (dictation) of the image was not, in fact, performed by the doctor whose signature appears on the report and under whom the study was billed. Instead, the signature line with the initials of everyone involved includes a third set of initials, initials that are also found (in place of the physician's) in the line identifying the date and time of the report's dictation. So, for example, in a report signed by Dr. Stephen Pomeranz, the initials following the "D" will not be "SP," but instead will reflect the initials of a physician assistant or other non-physician who actually reviewed the MRI.

44.     Using the services of a non-physician to interpret advanced diagnostic images directly violates federal regulations, which provide that payment will be made only for radiology services and interpretations performed by an M.D. or D.O.

45.     ProScan uses (or has recently used) at least four non-physician "ghost readers" to provide the services that should be provided by licensed physicians. Michael Boyce is a certified physician assistant who lives in Ohio. David Brodbeck is a certified physician assistant who lives in Ohio. Robert Pare is a certified physician assistant who lives in Ohio. Bryan Hosler is a doctor of chiropractic (DC) who lives in Ohio.

46.     At ProScan, these "ghost readers" routinely and systematically review MRI images, render a diagnosis, and provide an interpretation based upon their own review with no

physician input. The radiologist or a designated person (ghost signer), who finalizes reports by logging in as the doctor, then routinely and systematically adds his electronic signatures to these interpretations without viewing any of the images, let alone conducting a full review of every image, diagnosis, and interpretation, as required by federal regulations.

47.     By using physician assistants instead of licensed radiologists to interpret advanced diagnostic images, ProScan saves itself millions of dollars in salaries by hiring lower-paid physician assistants in place of higher-paid radiologists, who alone are qualified to do the work. Moreover, by putting the names of Stephen Pomeranz, M.D., or Malcolm Shupeck, M.D., F.A.C.S. on the large number of reports that the ghost readers dictate, ProScan saves itself the tedious and time-consuming procedure of hiring new doctors, licensing them in every state in which ProScan reads images, and having them credentialed by every insurance company by which patients may be covered.

**C. Defendants' fraud is harming patients and threatening their lives.**

48.     This lack of proper review has caused injury to patients whose images were mistakenly read as normal by the unlicensed readers and not properly reviewed by a qualified physician. Likewise, ProScan frequently misdiagnoses as serious—and even life-threatening—imaging findings that are of no consequence. The practices in which ProScan engages are not only illegal, they also endanger patients' health, safety, and even lives by failing to provide them with the correct diagnosis and treatment.

49.     As an example of the threat to the patients' lives, in October 2017—just as Relators were preparing to file their initial Complaint in this matter—a referring physician requested that Dr. Rothschild review an MRI performed at ProScan on one of her patients,

"J.P." The referring physician was examining J.P., a jockey, for return to work after an injury, because his MRI, according to ProScan, ostensibly showed no acute injury.

50.     Patient J.P.'s MRI report stated, "horse fell on patient, has neck pain, headaches, bilateral arm pain, numbness and tingling in both hands with weakness."

51.     Although the MRI report is electronically signed by Benjamin LeSar, M.D., the end of the report, below Dr. LeSar's signature, reads "D: MCB 10/03/2017 3:19pm." This indicates that this exam was read and dictated not by Dr. LeSar (who is a board-certified neuro-radiologist) but instead by a person with the initials M.C.B. That person is Michael Christopher Boyce, a ProScan physician's assistant.

52.     Relator Dr. Rothschild personally reviewed the MRI exam and was shocked by the numerous, life-threatening, obvious conditions, evident on almost every one of the eight sequences, that the physician's assistant had missed.

53.     First, there are two severe spinal-cord injuries, one of them hemorrhagic, in the jockey's neck, as well as a very dangerous 2-cm-long complete tear of the Interspinous Ligament at cervical level C 4-5, near the spinal cord in his upper neck.

54.     This ligament stabilizes the neck, protecting the spinal cord from damage during motion. When this ligament is torn, the patient is at very high risk of becoming paralyzed from the neck down or, worse, of expiring if he sustains any further injury or trauma. These serious conditions made the patient a ticking time bomb.

55.     A board-certified neuro-radiologist would not have overlooked all these obvious and critical findings on so many images, findings so obvious that they would be reported even by a first-year radiology resident. The only explanation is that Dr. LeSar never looked at any of the over 200 images. It appears that Dr. LaSar either batch-signed the report

(that is, signed multiple reports simultaneously without reviewing images) or that someone else ghost-signed this case for him, possibly without his knowledge.

56.     As another example, in or about June 2017 Relator Dr. Rothschild received a referral from a neurosurgeon for a second MRI to be done on a patient, with the initials K.H., whose original MRI was performed at ProScan in Louisville. The ProScan report's signature block reveals that the MRI was read by a physician assistant but signed by Malcolm Shupeck, M.D., F.A.C.S. That assistant identified a tumor in the spinal canal, which caused the initial referral to a neurosurgeon. Luckily for that patient, the neurosurgeon suggested a second MRI at Dr. Rothschild's facility before any surgery or radiation therapy was performed on the supposed "tumor." The MRI performed under Dr. Rothschild's supervision revealed that the object in question was not a tumor at all, but merely a normal vein. No board-certified radiologist would mistake a vein for a tumor. Meanwhile, the patient most likely spent almost three months in mental anguish over the news that he had a spinal tumor. Had a physician even glanced at this case, this rookie error would have been caught.

57.     These examples represent the tip of the iceberg of the patients ProScan is injuring. Every day this practice goes on, hundreds of other patients are subjected to improperly read MRIs performed at ProScan centers, leading to countless wrongly diagnosed patients who are unaware of the potential harmful consequences of this fraud.

58.     And ghost reading by unqualified non-physicians may, if left unchecked, spread like cancer.

59.     As a board-certified diagnostic radiologist who is widely recognized in the field, Dr. Rothschild has received phone calls from referring physicians who have expressed grave

concerns about the ProScan's interpretation of MRI images. He has also personally reviewed numerous reports that a radiologist plainly did not dictate.

## D. Defendants' "ghost reader" practices have expanded to having "ghost signers" of reports.

60.     ProScan is apparently expanding its practices beyond the use of "ghost readers" by adding "ghost signers." ProScan's website currently advertises an opening for a "medical report editor," requiring a high-school diploma and "desiring" a two-year degree. Ostensibly, this position is to "finalize medical reports by proof reading for content and spelling" and to "edit, paginate, and amend reports based on customer and doctor needs." In reality, "finalizing" a radiology report includes signing or authenticating that report, which only the doctor who has read the case can legally do. The person finalizing the report would have to log in as one of the doctors using his or her password. In this way the report would be faxed to the referring doctor and insurance company with the electronic signature of a doctor who may never even have seen the report, much less the images.

61.     It makes no sense for a board-certified radiologist who is interpreting and reading his or her own cases to hire a high-school graduate to check his or her spelling and use of the correct medical terminology, both of which the radiologist would know infinitely better than a non-medically-trained high-school graduate. Many of the words that a radiologist would use—particularly in an MRI report—are advanced medical terms whose meanings and context can be understood only by a highly trained physician. Indeed, it is common for a fully licensed and trained physician to call the radiologist for help in understanding a radiology report. The report's wording must be clear and precise to convey the proper interpretation or a misdiagnosis could occur, with devastating impact on the patient and their family.

62.     The person who "finalizes" a radiology report would be the last person to look at the report and correct any errors or inaccurate diagnoses before it is sent to the referring doctor and/or the patient. The last person to review such a report should always be the interpreting radiologist who is legally accountable for that report. It is illogical and dangerous for an individual whose education ended at high school to take over the radiologist's job of ensuring that the report has the correct diagnosis and is accurate.

63.     ProScan's touted job opening shows ProScan's illegal use or intended use of ghost signers in addition to ghost readers.

64.     Using ghost readers (untrained, unqualified, unlicensed, untested, non-physician auxiliary medical personnel) to interpret highly complicated, advanced medical imaging studies is not only fraud; it is a clear and present danger to the public. This case presents the opportunity to send a strong, necessary message to radiologists and radiology administrators that the illegal practice of putting a radiologist's name on an MRI, CT, ultrasound, or other report that was actually interpreted by a ghost reader will not be tolerated, and that the fraud committed on the federal government will be redressed.

65.     ProScan's policy is that when referring doctors (that is, the doctors who ordered the study) have questions, they are directed to the physician assistant who read the case, not to the doctor whose digital signature is on the report. The only reason for this practice is that the signing doctor would be unfamiliar with the case, which is further proof that the doctor whose name is on the report never read the case. This practice puts the patient at great risk. A crucial job for all radiologists is to consult with referring physicians when they have important, critical questions concerning patient care. This is where the radiologist's full fund of knowledge with extensive experience in medical school, internship, and residency comes into play. And this risk

is why it is crucial that a radiologist, and never a non-physician, is always available to consult with the referring doctors.

66.     If ProScan is allowed to continue this fraud, the United States will continue to be cheated not only by ProScan itself but also by those who have learned of this "method" of increasing their income from Pomeranz and Shupeck, or who are forced to use ghost readers to compete in price with ProScan. Honest physicians and MRI services will suffer from unfair competition. And, most critically, increasing numbers of patients will suffer when they are misdiagnosed as a result of having their MRIs, CTs, and other advanced diagnostic images interpreted by ghost readers instead of licensed physicians.

67.     ProScan covers its tracks for any missed or incorrect diagnoses by telling the referring doctors that the images are no longer available after one year. Relators believe that ProScan destroys its records after a set period of time to further protect itself from any malpractice claims that might arise from ghost reading and ghost signing. ProScan may be destroying up to 2,000 patient files a day, preventing or making more difficult any further review of those images.

### E.  ProScan's physicians engage in self-referrals for federally insured patients.

68.     ProScan's imaging centers are owned, in whole or in part, by physicians. Under the Stark Law and the federal Anti-Kickback statute, the physicians who own a portion of the imaging center cannot refer their federally insured patients to that imaging center.

69.     Nonetheless, ProScan frequently violates the Stark Law and Anti-Kickback statute by accepting federally insured patient referrals from the physicians who are investors in and owners of the very center to which such patients are referred. Relator Jason Taylor has personal knowledge of this practice regarding ProScan's Louisville facility.

70.     In cities other than Louisville, ProScan routinely tries to avoid the requirements of the Stark Law and Anti-Kickback statute by having its physician investors engage in cross-referrals as part of a prohibited circumvention scheme.

71.     ProScan's business practice is to open at least two imaging facilities in every city in which it operates. These imaging facilities are typically on opposite sides of town. Physicians invest in the facility that is farthest away from their own office rather than the one that is located in the geographic area of their medical practice. In other words, physicians who practice in area "A" invest in an imaging facility in area "B," and physicians who practice in area "B" invest in the imaging facility that is located in area "A."

72.     Once the investments are made, the physicians refer their patients to the ProScan facility that is located in their own geographic area rather than the one in which they hold an investment, with the tacit or express understanding that the physicians invested in the other facility will do the same thing. Thus, the "A" physicians refer to the facility that is owned by the "B" physicians, and the "B" physicians, in turn, refer their patients to the facility owned by the "A" physicians. ProScan has therefore created a system in which its invested physicians engage in just the kind of cross-referral scheme outlawed by the Stark Law and the federal Anti-Kickback statute. ProScan knowingly accepts payments from Medicare and Medicaid for these wrongful referrals.

## V.      Claims

### Claim 1
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729–33

73.     The preceding paragraphs are incorporated.

74.    Relators bring this civil action on behalf of the United States of America against Defendants under the False Claims Act, 31 U.S.C. §§ 3729–33.

75.    Defendants knowingly, in reckless disregard for the truth, or in deliberate ignorance of the truth or falsity of the information included, presented or caused to be presented false or fraudulent claims for payment to federally funded health-insurance programs in violation of 31 U.S.C. § 3729(a)(1).

76.    Defendants furthermore knowingly, in reckless disregard for the truth, or in deliberate ignorance of the truth or falsity of the relevant information, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to obtain the payment or approval of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(2).

77.    The United States of America, through the government programs, was unaware of the falsity of the claims and/or statements Defendants made or caused to be made, and relied on the accuracy of the claims and statements Defendants made in paying for diagnostic and medical procedures and services that were purportedly provided to individuals insured by federally funded health-insurance programs, including Medicare, Medicaid, and Tricare. If the government had known the truth regarding the false and fraudulent nature of the bills Defendants presented or caused to be presented, payment would not have been made for these claims.

78.    The United States has been injured as a result of Defendants' actions in an amount estimated to be in the hundreds of millions of dollars.

### Claim 2
### Conspiracy to Violate the False Claims Act
### 31 U.S.C. § 3729(a)(3)

79.    The preceding paragraphs are incorporated.

80.    Defendants conspired with each other and with unnamed co-conspirators to cause false and fraudulent claims to be submitted to and paid by the United States, through the Medicare, Medicaid, and Tricare programs. Defendants further conspired together to withhold information specifically known to Defendants regarding the false and fraudulent billing practices of Defendants to federally funded healthcare programs.

81.    Defendants acted in a concerted fashion to defraud the United States, and acted together in concealing the facts necessary to investigate the fraud and the damages caused by the fraud. Accordingly, Defendants violated 31 U.S.C. § 3729(a)(3).

82.    The United States has been injured as a result of Defendants' actions in an amount estimated to be in the hundreds of millions of dollars.

## VI.    PRAYER FOR RELIEF

Relators thus respectfully request the following relief:

(a)    That Defendants be ordered to cease and desist submitting or causing to be submitted any false or fraudulent claims to government programs;

(b)    That judgment be entered in favor of the United States and Relators and against Defendants in the amount of each and every false or fraudulent claim multiplied by three as provided by 31 U.S.C. § 3729(a), plus a civil fine for each and every such claim in the amount of between $5,500 and $11,000 per claim for violations before November 1, 2015, and between $10,957 and $21,916 per claim for violations after November 1, 2015;

(c)    That Relators be awarded the maximum amount permissible under 31 U.S.C. § 3730(d);

(d)    That judgment be entered in favor of the United States and Relators in an amount equal to a refund of all Medicare and Medicaid claims paid to ProScan that resulted from an illegal referral, under 42 U.S.C. § 1395nn(g);

(e)    That Defendants be sanctioned, including denials of payments, refunds of claims under 42 U.S.C. § 1395nn(g);

(f)    That Defendants also be penalized in an amount of up to $15,000 for each Stark Law violation and up to $100,000 for each illegal circumvention scheme and failure to report such schemes;

(g)     That judgment be granted for the United States of America and Relators
        and against Defendants for any costs, including but not limited to court costs,
        expert fees, and all attorneys' fees and expenses incurred by Relators in the
        prosecution of this case; and

(h)     All such other and further relief, at law or in equity, to which the United
        States and Relators show themselves to be justly entitled.

## VII.   JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: March 26, 2018

Respectfully submitted

Subodh Chandra (OH Bar No. 0069233)
TRIAL COUNSEL
Donald Screen (OH Bar No. 0044070)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Phone: 216.578.1700 Fx: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com

Per consent:
Elizabeth K. Stepp
Texas Bar No. 00788467
E-mail: eks@federal-lawyer.com
Lynette S. Byrd
Texas Bar No. 24047126
Email: lsb@federal-lawyer.com
OBERHEIDEN & MCMURREY, LLP
5720 LBJ Freeway, Suite 250
Dallas, Texas 75240
Telephone: (214) 334-7648
Fax: (972) 559-3365

*Attorneys for Relators*

## Certificate of Service

This First Amended Complaint, filed under seal on March 27, 2018, will be served by mail and email to the United States Attorney for the Southern District of Ohio and by mail the United States Attorney General. It will then be served when unsealed as ordered by the U.S. District Court.

Attorney for Relators